FILED

02/07/2025

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 3, 2025

IN RE CONNOR A.

**Appeal from the Juvenile Court for Coffee County**
**No. 22-JV-452      Greg B. Perry, Judge**
_____

**No. M2024-01236-COA-R3-PT**
_____

Mother appeals the termination of her parental rights on grounds of (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by failure to provide a suitable home; (4) substantial noncompliance with the permanency plans; (5) persistence of conditions; and (6) failure to manifest an ability and willingness to assume custody or financial responsibility of the child. Because the Tennessee Department of Children's Services does not defend the grounds of abandonment by failure to provide a suitable home or substantial noncompliance with the permanency plans, we reverse as to those grounds. And because the trial court failed to make sufficient findings that returning the child to Mother would pose a likelihood of substantial harm, we vacate the ground of failure to manifest an ability and willingness to assume custody or financial responsibility of the child. Otherwise, we affirm the decision of the trial court to terminate Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Vacated in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Michael P. Stewart, Manchester, Tennessee, for the appellant, Jessica A.

Jonathan Skrmetti, Attorney General and Reporter; Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

In March 2020, law enforcement performed a child welfare check on the home of Respondent/Appellant Jessica A. ("Mother") and her three children.[1] Ultimately, the officers were forced to use a saw to cut the home's door open with Mother and the children inside. Around the same time, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") received a referral that Mother's children, including Connor A. (born in September 2017), were drug exposed.[2] Upon DCS's investigation, Mother admitted that she was using Suboxone illegally, as her prescription had run out. Mother further admitted that she had obtained an order of protection against her husband Bradley A. ("Husband") but was still in contact with him. Mother also stated that she and her children were evicted but refused to state where she planned to live with the children other than that they might go to a shelter. The oldest child also reported that Mother drank a lot and talks about things that are not there.

DCS filed a petition in the Coffee County Juvenile Court ("the juvenile court" or "the trial court") to adjudicate the children dependent and neglected on April 14, 2020. The juvenile court entered an order on April 16, 2020, placing the children in Husband's custody and ordering that Mother would have no contact with the children. Husband did not comply with the juvenile court's order to keep the children from Mother, leading to another order placing the children with a paternal aunt ("Aunt").

On August 10, 2020, the juvenile court adjudicated the children dependent and neglected, in part based on Mother's admission that she had relapsed into alcohol abuse and the juvenile court's findings that Mother violated the no contact order, was involved in a domestic incident with Husband, and was uncooperative with law enforcement. Because Aunt could not keep all of the children in her custody, the juvenile court soon granted custody of Connor to DCS, who placed him with a foster family, where he remained until the trial in this cause.[3]

Eventually, on November 7, 2022, DCS filed a petition to terminate Mother's parental rights to Connor, alleging as grounds: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by failure to provide a suitable home; (4) substantial noncompliance with the permanency plans; (5) persistence of conditions; and (6) failure to manifest an ability and willingness to assume custody or financial responsibility of the child.[4] Mother filed a pro se answer denying the material allegations contained therein on December 2, 2022. DCS filed an amended petition on September 19,

---

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

[2] Only Connor is at issue in this appeal.

[3] The facts related to the placement of Mother's other two children are somewhat convoluted and not relevant to this appeal. They were not in her custody at the time of the termination trial.

[4] The petition also alleged grounds for termination against Connor's biological father, whose rights were terminated but not at issue in this appeal.

2023, to include allegations against Husband, who is not at issue in this appeal.[5]

A hearing was held on DCS's petition over several days in March 2024. The issues at trial concerned Mother's substance abuse treatment, visitation, housing and employment. Mother was also incarcerated at times during the custodial period, including in the four months prior to the termination petition being filed, as the parties stipulated that Mother was incarcerated from August 1, 2022, to August 16, 2022.

According to the testimony at trial, DCS created several permanency plans for Mother,[6] which required that Mother complete mental health and alcohol and drug assessments and follow recommendations, obtain a legal source of income, obtain transportation, obtain safe and stable housing, participate in parenting classes, maintain visitation with the children, refrain from using alcohol or drugs, and sign releases for DCS.

But Mother's DCS workers testified Mother's efforts to complete these requirements were either half-hearted or significantly delayed. For example, while Mother did attend at least two inpatient substance abuse treatment programs,[7] she refused to be separated from Husband at one treatment, even when DCS recommended that they complete treatment separately due to prior domestic violence between the couple. As for her alcohol and drug assessment, DCS took issue with Mother's failure to disclose to the assessor that she was using Suboxone. As such, DCS asked Mother to complete a second assessment; Mother never provided DCS with proof that she had done so. Mother also never provided proof to DCS that she completed a mental health assessment.[8]

Mother claimed, however, that she participated in two outpatient programs related to drug abuse or mental health following the completion of her last inpatient program. But Mother presented no documentary proof of these treatments other than a letter purporting to be from Bradford Health with no letterhead, no date, and no signature. Mother also failed to sign releases for DCS to obtain records regarding her alleged treatment at Bradford Health. Additionally, Mother claimed to have completed parenting classes, but did not provide proof of participation or completion to DCS. Mother did, however, complete domestic violence classes that were set up by DCS.[9]

---

[5] The trial court ruled that Husband had no standing to contest the termination as he was not the biological parent of the child. Husband has not appealed that ruling.

[6] Not all of the permanency plans were submitted as exhibits.

[7] The record contains a certificate indicating that Mother successfully completed a month-long treatment at Mirror Lake Recovery Center on November 10, 2022. The record also contains a letter from Evolve Behavioral Health that indicates that Mother was being treated there during the same time frame. At trial, Mother claimed that the dates must have been wrong and that her stay with Evolve occurred immediately after her release from Mirror Lake. According to the testimony at trial, Mother also attended Mirror Lake shortly after the children were removed in 2020.

[8] Mother claimed that she had participated in a mental health assessment during one of her stints in inpatient rehabilitation.

[9] There was no proof that Husband, the alleged perpetrator of the violence, completed domestic

According to DCS's proof, Mother also failed to consistently submit to random drug screens requested by DCS,[10] provide DCS with a valid driver's license,[11] provide DCS with a transportation plan, or provide DCS with more than scant proof of employment. At the outset of the case, Mother was homeless and incarcerated for a time. She later claimed to live with friends. Although she eventually claimed to have appropriate housing, Mother only provided a lease signed in January 2022 to DCS in late February 2023.[12] Mother, however, testified that she believed she had provided all necessary documentation to DCS, at least by the deadlines imposed by her DCS workers, and that while she had delayed providing documentation in some instances, she did so because she was waiting for her life "to be more settled[.]"

Despite Mother's claim to have various employers over the course of this case,[13] she paid no child support for Connor from June 8, 2022, to November 28, 2022. Mother claimed that she believed that child support for all of the children was being deducted from her paychecks. At the time of trial, Mother had paid only $246.69 in total support for Connor and owed $1,203.31. On the final day of trial, Mother's counsel stated that Mother was prepared to pay half the arrearage "via her husband."

Mother's visitation was a significant issue in this case. At the beginning of the custodial period, for the most part, Mother regularly participated in visitation and was appropriate during the interactions. On March 17, 2022, however, the juvenile court suspended Mother's visitation and ordered her to take a hair follicle drug test at the Coffee County drug court and a urine drug screening, submit to a pill count, and obtain a new alcohol and drug assessment. Once Mother completed those requirements, the juvenile court directed her to "file a motion to modify the . . . visitation."

Mother claimed to have taken a hair follicle drug test following the March 2022 order at a different location. But the documentation that Mother submitted at trial as proof of this test indicated that the test was administered more than ten days prior to the March 2022 order. The only other drug screening included in the record after the March 2022 order was administered on March 6, 2024, after the termination trial was underway;[14] Mother tested negative for all substances other than Suboxone in the 2024 test.

---

violence classes.

[10] The record contains one drug screening for Mother that was administered by DCS in June 2020. Mother was negative for all substances other than Suboxone. Later, Mother asked that DCS administer tests closer to where she lived, but DCS was unable to do so.

[11] At trial, Mother submitted a Mississippi license that was no longer valid due to the length of time that she had lived in Tennessee.

[12] By the time of trial, Mother was living elsewhere, as discussed *infra*.

[13] Mother claimed to work at Sally's Scrubs, Under Armour, a convenience store, Tiny Tots, PTS Scrubs, and a towing company.

[14] The test does not indicate whether urine or hair was tested.

Approximately a year after visits were suspended, Mother filed a motion for reinstatement. Therapeutic visitation was reinstated by order of March 8, 2023, after which Mother had five visits. Although Mother was late to or left early for the visits,[15] Mother was generally appropriate and brought gifts and snacks for the child. Sometimes, however, Mother was on her phone during the visit and she and the child seemed detached. And Connor had negative reactions to the visits. He often asked his foster mother to wait in the car for him during the visits and expressed that he did not want to attend. After the visits, Connor would become withdrawn and would destroy or throw away the toys that he was given. Connor even acted violently toward one of his foster brothers after a visit because he "was mad, and he didn't want to go back to the place that he had to go." Connor would take several days to return to normal after the visits.

Mother's visits were suspended once again on June 12, 2023, until Mother completed another hair follicle drug test and provided proof of an alcohol and drug assessment, mental health assessment, housing, income, and random drug screens. By the time of trial, Mother had not seen Connor for nearly a year.

Mother testified that her children were removed from her custody due to false accusations. She denied that she abused drugs but then admitted she used methamphetamine during "a season of my life" and that she was drinking alcohol every day and using Suboxone when the children were in her custody. She further admitted that missing alcohol and Suboxone "wasn't really good." Mother denied that she should have been diagnosed as dependent on opioids despite her current Suboxone prescription.

Mother conceded that she took out an order of protection against Husband based on allegations that he was physically violent, neglectful of the children, and mentally abusive to Mother for the entire marriage; that he threatened to light Mother on fire in front of the children; and that Connor was "scared of him and cannot be around him without panicking." But at trial, Mother claimed that only some of those allegations were true and that the false allegations were due to her being under the influence of alcohol at the time. Still, Husband was charged with aggravated assault related to an incident involving Mother with the children present; that charge was dismissed after Mother declined to prosecute.

Although they separated for a time, Mother was both residing and working with Husband at the time of trial. According to the lease that she provided to DCS the day before trial, their residence was provided by their employer and contingent on their continued employment. But the employment required that Husband drive a truck and Husband's license was revoked, so Mother was essentially driving Husband around for his employment, despite her own invalid driver's license. As a result, the towing company

---

[15] At one visit in which Mother left early, the DCS worker asked Mother to submit to a drug screen. When Mother was unable to produce a sample at the beginning of the visit, the DCS worker asked Mother to produce one at the end of the visit. Mother then had to leave the visit early.

would not pay double for both Mother and Husband to do the same job.

When Connor came into DCS custody three-and-a-half years prior to trial, he was non-verbal, hyperactive, and threw tantrums when he was upset. Connor's tantrums included throwing items at people, kicking walls, and drooling on himself. After months of positive reinforcement from his foster family and speech and behavioral therapy, Connor's communication and behavior had vastly improved.

Connor had also bonded with his foster family. He thinks of his foster siblings as his siblings and refers to his foster parents as "mom" and "dad." He does not mention Mother and never asked to see her even when visitation was ongoing. Connor's foster family was "very interested" in adopting him.

On June 3, 2024, the trial court entered a written order terminating Mother's parental rights on the grounds alleged and finding that termination was in Connor's best interest. In particular, the trial court found that Mother was not credible in her testimony. This appeal followed.

## II. ISSUES PRESENTED

In this appeal, Mother argues that the trial court erred in finding each of the six grounds for termination of her parental rights, as well as in finding that termination is in Connor's best interest.

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (quotation marks and citations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing

evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See* ***In re Valentine***, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." ***In re Addalyne S.***, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." ***In re S.R.C.***, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court has previously explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. ***In re Taylor B.W.***, 397 S.W.3d 105, 112 (Tenn. 2013); ***In re Justice A.F.***, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002); ***In re Justice A.F.***, 2012 WL 4340709, at *7 (citing ***In re M.L.D.***, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. ***In re Taylor B.W.***, 397 S.W.3d at 112; ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); ***In re Justice A.F.***, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See* ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); *see also* ***In re Samaria S.***, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d [240,] 246 [Tenn. 2010)].

***In re Markus E.***, 671 S.W.3d 437, 457 (Tenn. 2023).

## IV. ANALYSIS

### A. Grounds

In this case, the trial court found six grounds for termination of Mother's parental rights. However, DCS does not defend the grounds of abandonment by failure to establish a suitable home or substantial noncompliance with permanency plans. So we summarily reverse as to those grounds without taxing the length of this Opinion with unnecessary analysis. *See, e.g.*, **In re Nakayia S.**, No. M2017-01694-COA-R3-PT, 2018 WL 4462651, at *3 (Tenn. Ct. App. Sept. 18, 2018) (stating that DCS conceded two grounds on appeal and therefore the grounds were waived and summarily reversed). We therefore proceed to consider the remaining four grounds.

### 1. Abandonment by Failure to Visit and Failure to Support

DCS first asserts that the trial court correctly concluded that Mother had abandoned Connor by failing to visit or support him under Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(a). Pursuant to these statutes and relevant to this appeal, abandonment is defined as follows:

> A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
>
> . . . .
>
> (b) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of nonincarceration immediately preceding the filing of the action[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).[16] Given that Mother's sixteen-day incarceration period in August 2022 must be excluded, the proper time period spans from June 24, 2022, to November 6, 2022.[17]

---

[16] Throughout this Opinion, we apply the version of the relevant statutes that were in effect at the time the petition was filed.

[17] The parties agreed to consider a slightly longer time period at trial—from June 21, 2022, to November 6, 2022—but any miscalculation is nothing more than a harmless error in this case. See, e.g., **In re J'khari F.**, No. M2018-00708-COA-R3-PT, 2019 WL 411538, *9 (Tenn. Ct. App. Jan. 31, 2019); **In re**

We begin with visitation. There is no dispute that Mother did not visit with Connor during the relevant time frame. Indeed, at that time, Mother was prohibited from visiting due to the March 2022 order of the juvenile court directing Mother to take various drug tests before seeking to reinstate visitation.

On appeal, Mother offers little argument to undermine the trial court's findings as to this ground, arguing only that visits were suspended by order of the court and that when Mother did have visits, they were overall positive. Although not stated as such, Mother's argument raises the question of whether her lack of visitation was willful. Lack of willfulness is an affirmative defense that Mother was required to prove by a preponderance of the evidence. *See* Tenn. Code Ann. § 36-1-102(1)(I). But DCS asserts that Mother waived the defense by failing to raise it in her answer. Willfulness was mentioned, however, during opening arguments at trial and Mother's justifications for her lack of visitation and support were thoroughly examined at trial without objection. The trial court also mentioned willfulness in its written order. As such, in an abundance of caution, we address the willfulness of Mother's failure to visit and support as though the issue were tried by consent. *Cf.* **In re Christopher L.**, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at \*5 (Tenn. Ct. App. Sept. 13, 2021) (holding that the parent waived the defense of willfulness by not raising it in an answer, but that the issue was tried by consent).

When a parent refuses to cooperate with conditions or requirements in order for visitation to be reinstated after a suspension, the parent has acted willfully in failing to visit. *See, e.g.*, **In re Destyni S.**, No. M2022-00910-COA-R3-PT, 2023 WL 4074805, at \*13 (Tenn. Ct. App. June 20, 2023), *perm. app. denied* (Tenn. Sept. 11, 2023); **In re Connor B.**, No. M2021-00700-COA-R3-PT, 2022 WL 2452266, at \*5 (Tenn. Ct. App. July 6, 2022); **In re L.U.S.**, No. E2017-01777-COA-R3-PT, 2018 WL 5118529, at \*7 (Tenn. Ct. App. Oct. 19, 2018); **In re Jaylah W.**, 486 S.W.3d 537, 552–53 (Tenn. Ct. App. 2015). Here, Mother was directed to obtain both a hair follicle drug test and a urine drug screening, as well as a new alcohol and drug assessment. Mother submitted proof of a hair follicle drug test that was apparently administered prior to the trial court's order and no proof of either a contemporaneous urine drug test or the second alcohol and drug assessment. And she waited nearly a year to seek reinstatement of her visitation. Under these circumstances, we conclude that Mother failed to meet her burden to show that her lack of visitation was not willful.

Turning to support, the trial court found that Mother paid no more than token support during the relevant time frame. Specifically, the trial court found that although Mother was ordered to pay $50.00 per month in support for Connor, the child support record reflects no support payments between June 21, 2022, and November 6, 2022. And while Mother often brought gifts for the child to visitations, as discussed *supra*, no visitation was taking place during this time.

---

***Steven W.***, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at \*12 (Tenn. Ct. App. Nov. 28, 2018).

Mother does not point to any evidence that she actually paid support during the relevant period. Instead, Mother asserts that her non-payment of child support was not willful, as Mother testified that she was not aware that child support was not being deducted from her paychecks, she was incarcerated for a period of time, and she sometimes did not have employment due to her lack of transportation. Mother also asserts that DCS failed to make reasonable efforts to assist her in finding employment.

As an initial matter, the ground of abandonment by failure to support does not require proof of reasonable efforts to assist a parent in supporting their child. *See generally In re Kaliyah S.*, 455 S.W.3d 533, 555–56 (Tenn. 2015). Likewise, Mother is presumed to be aware of her duty to support all of her children and her inattention to one child is not a defense to a claim of failure to support. *See In re Archer R.*, No. M2019-01353-COA-R3-PT, 2020 WL 820973, at *7 (Tenn. Ct. App. Feb. 19, 2020) ("[T]he legislature presumes a parent who is at least eighteen years old is aware of his or her obligation to support his or her child, regardless of whether a court has entered an order requiring child support to be paid." (citing Tenn. Code Ann. § 36-1-102(1)(H))). Finally, we note that "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights[.]" Tenn. Code Ann. § 361-102(1)(F).

Here, the proof shows that Mother claimed to be working on and off throughout this case, and in particular following the March 2022 order suspending her visitation. In fact, Mother blamed her failure to comply with that order until a year later on the fact that she "stay[ed] pretty busy working." Then in July 2022, Mother reported to DCS that she had two jobs. And yet through, at best, the inattention that has plagued Mother's efforts throughout this case, Mother did not ensure that any support was being paid for Connor during the relevant time frame. As a result, Mother did not meet her burden to establish that her failure to support Connor was not willful. The grounds of abandonment by failure to visit and support should therefore be affirmed.

### 2. Persistence of Conditions

The trial court also terminated Mother's parental rights on the ground of persistence of conditions under Tennessee Code Annotated section 36-1-113(g)(3):

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian,

- 10 -

or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Here, there is no dispute that Connor was removed from Mother's legal and physical custody by an order entered in the course of a dependency and neglect proceeding more than six months prior to the termination trial. Mother argues on appeal, however, that the conditions that necessitated removal of her children do not persist, nor do any other conditions that would prevent return of Connor to her care.

The trial court disagreed, noting that Mother's efforts to change her circumstances were not timely or sufficient. The trial court found that Mother failed to provide correct information in her drug and alcohol assessment and then failed to obtain a second assessment despite multiple directives from both DCS and the trial court. Mother also failed to submit documentation to DCS or the trial court that she had actually completed any rehabilitation aftercare programs, any mental health assessment, or any parenting classes.

We agree. In addition to Mother's sporadic efforts to establish that she was engaging in mental health or drug treatment to ensure her continuing sobriety, the proof shows Mother continues to reside with Husband, who she accused of serious abuse toward both herself and her children. And Mother's current circumstances are precarious at best, given Husband's revoked driver's license and her own lapsed driver's license, which appear to be necessary for their continued employment and housing.

In contrast, the child is in a safe, stable, pre-adoptive home where he has made significant progress. *Cf.* *In re Allison S.*, No. E2023-01072-COA-R3-PT, 2024 WL 2050502, at *10 (Tenn. Ct. App. May 8, 2024) (finding that continuing mother's relationship with the child would diminish the child's chances of early integration into a safe, stable, and permanent home when the child "made great progress in her development and received necessary therapies and educational interventions" even though she was not in a pre-adoptive foster home). So the trial court did not err in finding clear and convincing evidence of this ground for termination.

### 3. Failure to Manifest an Ability and Willingness to Parent

The trial court also determined that Mother failed to manifest an ability and willingness to assume custody or financial responsibility of the child under Tennessee Code Annotated section 36-1-113(g)(14). Parental rights may be terminated where:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that the parent has failed to evince **either** an ability **or** a willingness to assume custody of the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). The second element requires proof that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

Here, while the trial court recognized that there were two separate prongs of this test, the trial court failed to make any explicit findings as to how placing Connor in Mother's custody would pose a substantial risk of harm to him under the second prong. This Court has previously held that a trial court's failure to make findings in support of the second element of the willingness and ability prong mandates that we vacate that ground. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *10 (Tenn. Ct. App. Aug. 15, 2023); *In re Nevaeh B.*, No. E2020-00315-COA-R3-PT, 2020 WL 4920020, at *3 (Tenn. Ct. App. Aug. 20, 2020); *In re Autumn D.*, No. E2020-00560-COA-R3-PT, 2020 WL 6306056, at *5 (Tenn. Ct. App. Oct. 28, 2020). We conclude that it is unnecessary to remand this ground to the trial court, however, because we have already determined that other grounds were properly found to support termination of Mother's parental rights. *See In re Zakary O.*, 2023 WL 5215385, at *10.

### B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Mother's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). In determining the best interest of a child, the court "shall consider all relevant and child-centered factors applicable to a particular case before the court." Tenn. Code Ann. § 36-1-113(i)(1). The factors "may include, but are not limited to":

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's

minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." Tenn. Code Ann. § 36-1-113(i)(3).

We look first to those factors related to the child's attachments. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's wellbeing), (D) (involving the security of the parent-child attachment), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), (I) (involving the child's relationships with others). The trial court found each of these factors to be in favor of termination, citing Connor's lack of attachment to Mother, his strong bond to his foster family, and his improvements while in his foster family's care.

On appeal, however, Mother takes issue with the trial court's decision to credit the foster family with Connor's improvement, rather than as a result of natural maturation. Mother also points out the lack of expert testimony to show that reunification would negatively affect the child. We agree with the trial court. Here, when Connor was removed from Mother's custody, there were obvious concerns about his tantrums and his lack of speech that could not be explained only by his age. While in the care of foster family, Connor's behavior has seen a marked improvement, as the foster family has provided the child with consistent treatment for these issues. In contrast, Mother was unable to provide proof that she is consistently treating her own addiction and mental health issues through proper aftercare or mental health treatment.

In addition, Mother cites to no legal authority that DCS was required to put on expert proof to show that Connor would be negatively affected by a return to Mother's custody. Not only would removal from his foster family likely cause at least a temporary suspension of the services that have helped him improve his communication and behavior skills, the proof shows that contact with Mother caused the child to act in negative and violent ways, in the limited instances in which she was permitted to have visitation. As such, the trial

court did not err in ruling that these factors support termination of Mother's parental rights.

We next consider whether Mother can meet the child's needs. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (R) (involving the health and safety of the home), (L) (involving whether DCS made reasonable efforts to assist the parent in making lasting adjustments), (O) (involving the parent's prior provision of safe and stable care to any child), (P) (involving the parent's understanding of the child's basic needs), (Q) (involving the parent's commitment to having a home that meets the child's needs), (S) (involving the parent's consistent payment of more than token child support) (T) (involving the effect of the parent's mental and emotional fitness on the child).[18] Again, the trial court found that each of these factors favored termination of Mother's parental rights.

Mother argues, however, that her efforts show that she has made improvements toward continuity and stability that the trial court should have weighed in Mother's favor, including through her attendance at rehabilitation programs and parenting classes. Mother also asserts that her current home is appropriate for the child and again argues that DCS did not exert reasonable efforts on her behalf.

We note, however, that the trial court expressed serious doubt that Mother had ever completed parenting classes, given the lack of documentation, as well as any successful aftercare treatment for her drug dependency. Moreover, Mother only provided proof of her current lease to DCS the day before the trial began, leaving DCS with little opportunity to determine whether it was actually safe and stable for the child.[19] And even if we were to assume that a home visit would have shown that this home is safe for the child, Mother's stability is still in question, given that her housing is tied to her continued employment.[20] Finally, to the extent that DCS was required to assist Mother in gaining employment, throughout this case Mother has informed DCS that she was sporadically employed at various locations but provided little proof of income. So then, this does not appear to be a case where Mother had difficulty finding employment and needed DCS's assistance to do so. Moreover, the proof shows that DCS consistently reached out to Mother to offer her

---

[18] The trial court found that factor (M) regarding urgency was inapplicable to Mother. It appears that the trial court focused on the first part of the factor related to establishing paternity, rather than the second portion related to "addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest." Elsewhere in the trial court's order is it clear that the trial court found that Mother lacked urgency to create a safe home to which the child could return.

[19] It does appear that Mother provided her current address at some point prior to trial to her court-appointed special advocate, but the advocate did not conduct a home visit due to her own health issues and, at the direction of her supervisor, because the termination petition had already been filed and no visitation was taking place.

[20] In addition to the issues with licenses that endanger this employment, the proof shows that Mother did not maintain any job for long throughout the custodial period. As such, we have serious concerns that this housing, like Mother's housing in the past, would not be long-term.

assistance in this case and that Mother's efforts in return were not reciprocal. Under these circumstances, we conclude that the evidence supports the trial court's findings as to these best interest factors.

The trial court also found that those factors that involve abuse to the child or others favor termination. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home). In particular, the trial court noted that Mother herself asserted that Connor was afraid of Husband when she took out the order of protection, but continued to live with Husband at trial. And there was no proof that Husband had completed any domestic violence or parenting classes. The trial court also referenced the fact that the child is fearful of attending visitation with Mother and always wants his foster mother close by.

Mother contends on appeal, however, that the trial court is making too much of a single domestic violence incident between herself and Husband. Mother also points out that she completed domestic violence classes. Respectfully, we disagree. Here, Mother testified at trial that at least some of the very serious allegations of abuse against Husband were correct, and yet she had consistently refused to disentangle herself from Husband even at the risk of termination of her parental rights. Moreover, the child's fear is not limited to Husband, but to some extent is also present when the child is forced to interact with Mother. These factors therefore also favor termination.

Thus, the vast majority, if not all of the best interest factors favor termination in this case. Certainly, this is not an extreme case where Mother herself has perpetrated physical abuse on the child or has been shown to be abusing drugs even days before trial. But what this case involves is a child who has been in foster care for a significant period of time waiting for his mother to do the things necessary to be returned to her custody. And Mother simply did not fulfill her obligations in either a thorough or a timely manner. Perhaps as a result of Mother's sporadic involvement in his life, often as a result of her own inaction, the child's significant relationships are not with Mother but with his foster family. "Once a parent has been found to be unfit, the interests of the parent and the child diverge. While the parent's interests do not evaporate upon a finding of unfitness, the focus of the proceedings shifts to the best interests of the child." *White*, 171 S.W.3d at 193. "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *Id.* at 194. Here, despite Mother's professed progress, the child's interest is best served by maintaining him in the home where he has thrived. As such, we affirm the trial court's finding that termination of Mother's parental rights is in the child's best interest.

## V. CONCLUSION

The judgment of the Coffee County Juvenile Court is vacated in part, reversed in part, and affirmed in part. The termination of Appellant Jessica A.'s parental rights to

Connor A. is affirmed, and this cause is remanded to the trial court for further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant, Jessica A., for which execution may issue if necessary.

s/ J. Steven Stafford<br>
J. STEVEN STAFFORD, JUDGE